1479 United States v. Ford Motor Company Mr. Leavitt, you're representing the government here? Yes, sir. And you just want to confirm you've reserved five minutes for rebuttal, correct? Yes, sir. All right. Well, you can begin whenever you're ready. On January 13, 2003, Ford Motor Company wrote a letter to the Customs Service, and I'm quoting it. They said, for it agrees that it will not assert any statute of limitations defense in any Section 1592 action for a period of 24 months from January 13, 2003. That was a waiver of the statute of limitations as a result of that. It was never accepted by the government, was it? It was acknowledged by the government after processing the waiver. The government had used the word accept in earlier years, but had administratively determined that that could potentially be a misleading word to use because it might imply some kind of a contractual understanding that the return for the waiver of customs would do something. There was no contractual understanding because under the common law, a waiver is just that. That's Justice Brandeis from the 1920s. Decisions are floor, shine, and stage. When a person unilaterally waives the statute by declaring affirmatively a promise not to assert the statute, that does not apply to this person. You had a regulation, though, that was in existence for this entire period that said that you would entertain waivers. It doesn't say that you would accept them or anything else, but you would entertain if they were for two years. Now, we had a long history of one-year waivers, which you accepted, I guess, under your discretionary authority. Now, why isn't that a course of action that would bind you until you announced a change? Well, this two-year waiver complied with that 1991 notice. That is, the notice indicated customs would accept waivers that were of at least two years in duration. This waiver wasn't two years in duration. If your question is, and that was a public notice. That 2001 notice was a public notice. So if you're thinking about the statute 1625C, that notice complied with that statute because that was a public notice. What wasn't public was a 1999 change. The change was not public. It was a 1999 change that came from the director of the rulings branch to the court director saying, henceforth, don't use the word accept when you advise importers that you're acknowledging their waivers because it could be misconstrued by the importers implying an obligation by customs to do something. Under the common law, a waiver is unilateral. So there is no implication that there's an obligation on customs to do something. But when your regulation, in effect, says it has to be approved for all these years, and it was accepted for nine years, I guess, the word accept was in there. Why isn't that a course of action, a course of dealing that has to be published if it's going to be changed? Interestingly, Congress, when it first enacted the internal revenue statutes, had a provision with respect to statute of limitations, and that provision said that when a taxpayer offers to waive, there needs to be an agreement by the commissioner before the waiver is recorded on the books or language like that. There were a number of cases where the commissioner made an error and stuck the waiver in the file but didn't agree to the waiver by returning a waiver form signed by him to the taxpayer. That was the case in Floresheim and Stange. Congress had required there be an agreement, but there was no formal agreement in the sense of a signature. Yet, in both Floresheim and Stange, Brandeis was very clear to say, in a unanimous court, that that obligation or that requirement that Congress imposed was simply to help the commissioner. Not doing it should not redound to the benefit of the taxpayer. The taxpayer didn't have to issue a waiver. The taxpayer did it because the taxpayer felt it was in their interest to do it. A clerical or other mistake by the commissioner could redound to the detriment of the commissioner, but it shouldn't redound to the benefit of the taxpayer. The revenue needs to be protected. I'm not going to defend those notices, the language of those notices that you're talking about in 76 and so forth. There was less than artful treatment of this in terms of the precise words that were used. What you come down to, though, in my opinion, is did Ford knowingly waive the statute? Even if customs made a mistake by not using the right word to acknowledge it, customs told Ford we have processed this, we're acknowledging it, we're not rejecting it, and furthermore, we've changed our policy to change words. If you have a question, let us know. When that was stated by customs to Ford, customs had four months under the prior waiver to bring suit, but Ford maintained total silence. To this day, they don't say they didn't understand what was going on in 2003 when this exchange occurred. Later, when the penalty continued to be pursued and Ford responded to the penalty notice, then for the first time this idea of a non-efficacious waiver came up, totally after the fact in order to justify what was seen as a potential defense to the case. So while there is some inartful use of words here, to our side, the issue is did Ford waive the statute? Did they know what they were doing? Despite customs not having been as artful as it might have been in terms of its response, did customs respond by not rejecting the waiver, which it didn't? Did it offer an opportunity to Ford to get an explanation? It did. Did Ford take that opportunity? No. Did Ford sit on its rights? Yes. Did it come up later? Yes. When did it come up? Only after customs pursued the administrative case. What would be the remedy at that point? Would it be a remedy of terminating the waiver or just abrogating the waiver, or would it be a remedy of going back to the old policy? Well, I think if there was some kind of a failure to dot every I and cross every T under your recent decision in this PAM case, which is 463 F3rd, decided in the brief, if it really didn't affect the substantive rights of the petitioner or the importer because he had voluntarily and knowingly waived the statute, the remedy is simply to advise customs to be more careful the next time, but not to invalidate a knowing waiver that induced customs, really, to forestall bringing a valid case in legitimate reliance upon the waiver. That is not the remedy. In this PAM case, the competing importers tried to get reversed in anti-dumping duty by saying they were disadvantaged by a technical failure published someplace, though it was published some other place. This Court unanimously and quickly rejected that, saying that's not the law. The law is it's got to be a substantive impact. Let me ask you, if I could switch gears a little bit here. The Judge Soukalos in the Court of International Trade, at the end of his opinion, he had a little section where he addressed your claim for the duties, the 5.2 million approximately in duties, and he said, well, it's moot in light of my ruling on the statute of limitations. In any event, it would be improper because these are not lawful duties. And I think, do you understand him to be saying in that little section they weren't lawful duties because of the ruling in the previous case, the O2 case, where they had to be paid back? That's what I understand it to be saying. And I know you know more about the protest case than I do because you're on the panel here. But the argument is that because this court found that the liquidation that Customs did was invalid because it was out of the statute of limitations. The extensions were improper. Yeah, that by virtue of the operation of the law, the duty that was declared by Ford on entry became the valid duty after one year. That was what the statute said. It was a liquidation by operation of law. But there's nothing in this. Your argument is on the duties, as I understand it, and I want to make sure I understand because I've been over it in the briefs and the Ford response. Your contention is that you can still under 1592D, is it? Yes. Come back to get these duties because they were not the correct duties and you were deprived of them just by a procedural error. That's right. Now, let me ask you, what is the status? The Court of International Trade did not say anything as an aside about the penalty claim, correct? In this case? Yes. They rejected the statute of limitations and he said nothing. But he didn't have additional language on that. So that is still there were it not for the dismissal. That's your complaint. If you reverse the statute of limitations, we can go and pursue the penalty claim. That's our position. I understand. It's a penalty claim, a prerequisite to bring to recovering the duties themselves. In other words, does there have to be a penalty imposed under 1292? As long as the failure to pay the proper penalty relates to an asserted misrepresentation, even if you find misrepresentation wasn't negligent, grossly negligent, or fraudulent, we are entitled under 1592D and, indeed, I will be able to collect that penalty. Yes. If there are no penalties due, though? If you find there are no penalties due because there is no negligence. Can you then recover the duties? Our position is yes, as long as you find that there was a misrepresentation, even if it was innocent, but that resulted in the lower, the inaccurate assessment of the duty. You're saying that in 1592 supersedes in 1504 the operation of law liquidation of the duties because the duties are not properly deposited or paid. And the reason was a misrepresentation in an entry record. Whenever an importer, by virtue of a misrepresentation, asserts the incorrect duty, when that's later found out, even if it turns out not to be fraudulent, negligently, or grossly negligent, we are entitled to those duties. Even if those duties were liquidated properly. So, in other words, if they didn't… Well, by definition, they probably wouldn't be. But we had a choice and we took a choice. We extended the liquidations and tried to get them that way because we were informed there might be a problem before the… We failed. Why should we… So we took too long. That's not reasonable. You're saying that if you had timely liquidated and then found out it was the wrong duty, you could come back under 1592d to get it, and you shouldn't be barred because of the deemed liquidation that took place in this case. That's precisely what we're saying. And we're saying all the case law supports that. Let me ask you just one other thing. You know from the brief, and Mr. Cooper will get up when he talks about this point, he'll say, well, there are a lot of findings in the Ford litigation, previously both, I guess, our decision and the decision of the Court of International Trade that preceded that, Judge Carman's lengthy opinion that followed the trial, where he made a number of factual findings. And, in fact, it seems that a lot of those findings were the subject of a stipulation by the parties as to what happened. And Judge Carman picked those up in his opinion, and then we picked them up in our opinion. Specifically, I'm thinking about the disclosure. It does seem to be undisputed that there was a disclosure made by sometime, I guess it was in early February of the applicable year. Why is that not an operative binding fact? Especially since it was, I think, the subject of stipulation before the CIT. The government believes in collateral estoppel to make the operation more efficient. We're not disputing any of that. The issue, however, is that what a prior disclosure is is a term of art. And if you make a general observation as background to a ruling and a decision that a letter was sent from Ford to Customs advising that it had been difficult for them to reconcile entries, you may say in your opinion, as you're going to the legal issue, that the letter was sent. You can't later come in and claim that's a collateral estoppel finding that there was a technical prior disclosure in 1592. 1592 was not in front of you in the protest action. And furthermore, in this case- Well, I'm thinking more of just the fact that Ford came in and said, look, we made an error here. It seemed that it was stipulated that that communication occurred. That letter is in this joint appendix. Ford did say that letter. In our view, if collateral estoppel helps either party here, it helps the government. Because if you look at Judge Carman's second opinion after the trial, it came out in that trial that the letter that Ford sent that you referred to as a disclosure did not contain accurate information concerning what Customs believed Ford did improperly about that federal foreign trade zone. Because Judge Carman pointed out that the way Ford set it up, there was no way prior to the engines or the transmissions coming into the zone to know whether the engine or transmission would be used in a truck or a car. They winged it, and they tried to take advantage of the differential tariff for assembled products versus parts. But they didn't have the system in place to enable Customs to monitor and audit what was going on. And Judge Carman pointed that out. And that was the error that should have been disclosed that wasn't disclosed. All that was disclosed... You're saying, okay, I understand. You're saying your contention is that there was a communication, but at most, in your view, a partial disclosure. They said we made a mistake. You're saying you would say, yes, they said we made a mistake, but they didn't go on to explain the deficiencies in their system. That's a charitable way, but I would even say the way they phrased the type of mistake was more misleading than helpful. Well, you've used up your rebuttal plus about a minute and a half, but you had a number of questions, Mr. Levin, from the panel, from all three members of the panel. So we'll give you your full five minutes of rebuttal. Thank you, Your Honor. So we'll hear from Ford. Mr. Cooper, let me ask you if I could. I'm sorry for jumping in before you've said a word here, but just so I don't forget, one point that's important for me, if we could start at the back, in a sense. I asked Mr. Levin a question about the duties, and he said, look, the reason we can come back and seek the $5.2 million in duties is the following. Number one, if we had liquidated timely and then saw there was an error, we could come back. We should not be barred from coming back for the duties simply because we were untimely in the extension or we didn't support the extensions and it was a deemed liquidation. What is your answer to that contention? Again, I'm sorry for just pouncing on you, but I wanted to just answer that question in my mind, and then you can go however you want to go in your argument. Sir, I'd first like to say good morning and thank you for introducing me. I'm sorry, I didn't give you a chance to, see, I was so intent on my question, I didn't give you a chance to exchange the usual pleasantries with the court. But anyway, go ahead. Thank you. I don't quarrel with their proposition as far as it goes. In other words, if they have liquidated and it's because they've been under some misapprehension, which 1592A comprehends, which it contemplates, such as there's been a misstatement, there's been some type of, even if it's a manuscript error, they can go back and seek to gain those unpaid duties and complete with penalties if it is because there's been fraud or gross negligence or even just negligence, they can do that. But what he doesn't contemplate in his analysis is when those duties have been paid pursuant to his liquidation as Ford did. You said 89 payment. Yes, Your Honor. The full $5.3 million paid pursuant to the liquidation. And then this court concludes that the duties are not due and owing to the government. They're not due and owing because a separate statute has precluded the government from collecting those duties because it hasn't pursued the investigation in a reasonable forthright manner as Congress insisted. So those duties this court ordered to be returned, now they're saying they come right back through 1592D, the back door, and none of that ever happened. So we don't have much to add to what Judge Zucala said. He said that he just doesn't think that's what Congress contemplates. Now you would say, okay, I understand that. Now on the penalty issue, do you look at that differently? In other words, as I read your brief, you say that the penalty issue is really cut off by collateral estoppel. You don't hang your hat on the 1504 liquidation. Well, we add to what Judge Zucala addressed by saying that there is preclusive effect to the earlier findings, preclusive effect at a couple of different levels. First, the prior disclosure level, Judge Shull, that you mentioned earlier, and the district court's clear findings per the government's stipulation, and this court accepting those findings, that, number one, Ford, and the findings are all, I can read them right here, from December 30th, from the opinion itself, from December 30, 1985, to February 7, 1986, Ford incorrectly entered NPF-designated engines and transmissions containing completed trucks at the parts rate instead of the rate applicable to completed trucks. For the entries that issue, Mr. Tulloch, you'll remember, checked the NPF box on all the CF-214s and paid no duty up front. That was the violation. And, in fact, the court held, the district court held, which Mr. Levitt relies upon, that at some point in January, early February 1986, Ford met with customs and disclosed the errors made. Ford made a full breast of this. That was stipulated. Nothing was held back. And with respect to this notion of inventory control, well, that was one of the reasons they said there was gross negligence. But it wasn't the violation, the element of violation, and for that proof, out of the government's own mouth, just read their complaint. Their complaint in this appendix, at page A400001-7, they say in paragraphs 16 and 17 of their complaint that the violations are described in paragraphs 14 and 15 of their complaint. 14 and 15 of their complaint allege exactly what the trial court found, and they say nothing. Now, nothing in this entire complaint mentions the inventory control. That wasn't an element of the violations. And what does 1592c-4, the prior disclosure statute, require? It either eliminates the penalty, at least under the 1986 regs, eliminates the penalty if the importer, quote, discloses the circumstances of a violation of subsection A. Ford disclosed those circumstances. There is a prior disclosure here. It eliminates the penalty if it's negligence or gross negligence. It limits it to 100% of the duties, that is the 5.3 million, if they were able to prove fraud. But was that a complete disclosure, Mr. Cooper, without disclosing the method by which they arrived at the duties? They did disclose the method in that. In the failure to check the box and the assessment at 3.3 rather than 25%. What about the inventory control system? Well, as I say, Your Honor, the inventory control system was not relevant, not relevant to the violation. It was relevant to the level of culpability. Nowhere in this complaint, in the complaint that they seek a penalty for, do they breathe a word about inventory control. It's not an element. But is D, really, 1592D, Part D of the statute, a penalty, or is that just a recovery of duties lawfully due? That's the recovery of duties lawfully due. It's not a penalty. Right, Your Honor. But it does require a 1592A violation in order to see it. Whether it's fraud, negligence, or gross negligence. So if they can prove negligence on any of the items that were brought in, whether it was a failure of the inventory control system or otherwise, that would be sufficient. So the prior disclosure would not be able to cut off the 1592D recovery. No, Your Honor. With all due respect, I do believe that they would have to prove, and the only thing they'd prove, in order to make out their claim that duties we're owing were not paid, which is 1592D, is that we entered truck parts in completed trucks and didn't pay the 25% as opposed to 3.3%. And that's all their complaint says. They don't say anything about the inventory control, either to support a magnitude claim or certainly not to support the underlying violation itself. Are you saying there has to be negligence before duties can be recovered under 1592? That's certainly how we read the statute. That's how we understand it. So it's a prerequisite that some penalty is to be imposed. Yes. Then you're saying that there was stipulated full disclosure in the prior case. Is that right? Yes, Your Honor. The party stipulated that Ford essentially made a clean breast of its errors. It considered them clerical errors. It asked to have them corrected. Customs refused. And that's how the protest liquidation got underway. If I could now switch gears, if there's no additional questions concerning the issue for you. You're not saying that they have to prove negligence in order to collect on a 1592D. They just have to allege negligence. Well, we understand that a 1592A claim is a prerequisite to a 1592 claim for unpaid duties that are due in effect. If they establish a 1592A claim, why would they need to proceed under 1592D? You can have a situation where you have violated 1592A, but the duties have been paid. For example, in this case, if there had been no finding by this court that customers were not because its investigation had lagged too long and was unreasonable. If there hadn't been that finding, if we had lost, they would have been entitled to the $5.3 million. But they would also have been entitled to go forward and seek penalties. Under A. Under A, not under D. Under A, yes, Your Honor. There would be no occasion to then claim the 1592D unpaid penalties because they obviously had been paid. And paid and liquidated, which were? Paid pursuant to the liquidation that our protest failed. By operation of law. This court held that by operation of law, the only duties that Ford owed, the only lawful duties, as the statute, the formulation used in the statute, were the ones that it paid. It was not due to pay additional duties, $5.3 million, and so customers had to refund those monies back. It was that intervening cause that none of Mr. Levitt's cases about but-for causation for a 1592D claim, excuse me, none of those deal with the situation where the court has ordered a deemed liquidation at a certain amount. And then customs has come back through a back door to say, none of that matters. We're still entitled to collect and to sue you for duties that we say that you owe us and that the court in a previous litigation has said you don't. Is that a but-for test or approximate cause? Well, we would argue, Your Honor, it's a but-for test, but it must be tested by approximate cause, standard approximate cause concepts. So if we test it under approximate cause, is there still a conflict between 1592D and 1504 by operation of law? In other words, if in fact you deem to be liquidated under 1504 and the duties are liquidated at that point, and instead of paying $100 in duties, you only paid $1 in duties, does the government still have a right to come back and say that you still owe us the $99 that should have been deposited? Your Honor, we say they don't. We say they don't because once a court, and Judge Sukala said, that once this court has ruled that as a matter of law, the duties are to be liquidated as paid, and that that is the cause, the approximate cause of any alleged loss. If loss there was, it was caused by the government's own conduct. So none of the cases dealing with but-for cause even suggest that the government's own conduct, which Congress recognizes as relevant to what duties must be paid, is irrelevant to whether or not customs can come in a second time and seek to re-litigate essentially that same issue. So we don't see a tension. We think the two fit together because customs' own conduct, which by operation of law denies it the ability to contest the entries, surely blocks its ability to come in under 1592D and contest the entries all over again as though it never happened. So 1592D then becomes a worthless statute. 1504 applies. No, Your Honor. No, 1504 applies only in those actually rare circumstances, I would think, when the Customs Department has done something on its own account that Congress says deprives it of the ability to seek additional duties. That would be the circumstance in which customs would be barred from denying that reality. If I could. Alderman, your time is just about up. But Mr. Levitt extended over. And if my math is right, he's going to have a total of about 23 minutes because I said he'd have his full. So you'll have from the time the red light goes on, we'll give you another eight minutes. That's very kind of you, Judge Shulman. I appreciate that very much. And he'll have six minutes. That should add it up about right. Fair enough, Your Honor. I would like to speak to the statute of limitations issue. And I'd like to open where Mr. Levitt opened, and that is with our January 13, 2003 letter. It's at page A400082 of your appendix. What Mr. Levitt did not quote to you were the very opening line of that letter. This letter serves to extend Ford Motor Company's previous offer to waive the statute of limitations. The very next line says, Ford hereby offers to waive the period of limitations. He does quote the beginning sentence of the last paragraph on this page. Ford agrees that it will not assert any statute of limitations. Yes, agrees. If its offer is accepted, it is agreeing not to assert the statute of limitations. The point is simply that the record simply couldn't be clearer that Ford, pursuant to longstanding course of dealing, Judge Archer, and specific published policies, offered to waive and provided an offer that, to be valid, had to be accepted. And had to be accepted by operation, again, your honors, of customs-owned published policies. TD7633, 30 years old now, began this policy. It's at page A400068. And it specifically is framed consistently in terms of custom service, and quoting, has the authority to accept an offer to waive elsewhere. The acceptance of an offer to refrain from asserting such a defense is exercised sparingly by customs. It will consider these offers, but it will only sparingly actually accept them. One of the most telling lines is the last paragraph of this TD. If the request is accepted, if it is accepted, a copy of the request signed as accepted by the assistant commissioner will be sent. And the form that customs prepared and suggested to importers specifically says, I hereby acknowledge receipt and acceptance. Through a consistent course of dealing, Judge Archer, with Ford, in this very case, nine prior offers to waiver and waivers were specifically acknowledged and accepted, except for this one. And I refer you again back to the January 13th, where Which page is that again, the January 13th? January 13th is page A400083. Well, at least that's the page I want to refer you to, where the word acceptance is clearly struck through. Your Honors, nothing could be clearer from the record of this case that this was an offer to accept, that under customs published policies, that offer had to be accepted in order to be valid, and that, in fact, this offer was not accepted. I am going to quote very briefly from TD 9011. That's the second in the series of treasury decisions that govern statute limitations, where they add that absent compelling circumstances, customs will not, as a matter of policy, favorably entertain offers  than the two-year period. Your Honors, Mr. Levitt makes much of two Supreme Court cases which he says, under the common law, a waiver of a statute of limitations is a unilateral act. That certainly can be true. It can be true. But in the context of customs clear policies and the course of dealing in this case and with other importers, it's quite clear that customs insisted that an offer to waive be submitted, that it kept control of whether or not the statute of limitations would be waived, not that the importer had unilateral control, and that it would decide whether or not the pressures that attend negotiations and settlement discussions and administrative procedures by the time clock would be relieved or would be increased. Mr. Cooper, what if there was a breach? You're saying this is a contract, basically. There's consideration from the government for accepting the waiver? Your Honor, the government suggests that contingent waivers do have to be accepted, i.e. those that are contingent on consideration of a settlement proposal. Well, the very premise, Your Honor, the very premise in these treasury decisions that I have quoted to you of an offer to waive the statute of limitations is that it, and now I'm going to quote, that it would provide the customs an adequate opportunity, quote, to consider the merits of a petition for relief from assessment of civil penalties. For the benefit of the person who submits the waiver? Of both sides, Your Honor. What's the benefit to the government? Well, the government doesn't have to sue you in the same benefit that is for the importer. Is that the consideration for the waiver? That... A standstill type of an agreement? No, it's that the government consider the points and petition and mitigation or the settlement proposal that the importer has advanced or that both sides consider a settlement proposal that the customs... Would the board have a cause of action for a breach of the waiver agreement by the government? Well, Your Honor, we are... We certainly recognize that... No, no, the question is whether or not there would be a cause of action by Ford Motor Company for a breach of the waiver agreement by the government. Your Honor, I don't believe there would be a cause of action if the government said, we accept the waiver, we refuse to consider anything in the administrative process, we're going to use this extra time to do nothing more than to polish our complaint and to better prepare ourselves to file a suit against you. But it would clearly be, Your Honor, not what was contemplated by customs-owned treasury decisions. So it's not really a contract? Your Honor, we accept the Supreme Court's statement that it's not a contract. In that case, what the importer or the taxpayer argued was that a six-year statute of limitations agreement, which both parties signed, actually trumped a congressional statute extending the statute of limitations a year beyond their agreement. And the Supreme Court said, well, no, of course, it doesn't contemplate a contract in that sense. But it does contemplate an agreement in the sense that the Supreme Court interpreted that waiver according to the intent of the two parties. And tolling agreements, Your Honor, are common every day. That happens every day in this court and every court in the country. You have tolling agreements. And both sides have to agree to the tolling provision or to the extension of the statute of limitations. But a waiver in this particular case that was offered by Ford, even if it was not accepted by customs, would you still be bound by it? What is your provision for waiving the... What is your consideration for waiving the statute of limitations? What do we give up? Your Honor, the one thing that we give up is certainty. And we are not... We give up the policies that statute of limitations are designed to promote. We oppose. We give up. We open ourselves to staler claims. We open ourselves up to the possibility that our defense, defenses may be prejudiced by operation of the additional time that the parties are now having. All of the things that we have statute of limitations for is what the individual waiving the statute gives up. But you also... Wouldn't it be a consideration to postpone the litigation with the government? I beg your pardon? Wouldn't you be in a position of postponing the litigation with the government? They would be in the same position as you would be, with stale evidence, so on and so forth? Yes, they would be in the same position. And so they too would be giving up those considerations. But let me ask this. What if the waiver had come back stamped rejected? Would we be charged with a unilateral act of waiving that notwithstanding that rejection, they could come in after the time had expired and sue us? That's their argument. And it's the necessary logic of their argument that there's no way we can condition a unilateral waiver. We can't make an offer. We can only make a waiver. They can't reject it. You've made a waiver. So if it's not rejectable, then they've accepted it. Well, no, Your Honor. We've made an offer to waive on its face, black and white. We didn't make a waiver. So they didn't accept it. And so it didn't come into existence. They either continued to consider it, our offer, or they rejected it. But either way, their own clear policies, written published policies, made clear that for there to be a waiver, they had to accept it. Only offers and requests for acceptance of waivers would be received. And they would sparingly accept them. Couldn't their action by filing the lawsuit within the time period of the waiver be an acceptance of the waiver? No, that would be a rejection. Within the acceptance of the waiver? If you extended it for two years, the offer was to extend it for two years. And within the two-year time period, the government files a lawsuit. Isn't that an acceptance of the waiver? Well, Your Honor, I would not think it's an acceptance of the waiver to wait until the period of limitations that would be extended has expired to respond to it. Well, they responded within one day, right? Before the expiration date? No, they filed one day before the expiration of the period that we had offered to extend it. So is that an acceptance of the offer? No, Your Honor, no. That's not an acceptance of the offer. Why not? Because, Your Honor, the statute had already told. No, you made the offer of extending it for two years. Within a two-year time period, they filed the act. Yes. That's an acceptance of the extension. It's hard to see how that's an acceptance if they sent back our offer with acceptance crossed through it. No, they acknowledged it. Yes, they acknowledged receipt of the offer. Receipt. Exactly. And in order to accept it, they had to do it before. By operation of law, they either filed their lawsuit or accepted the waiver according to the method and the form that they themselves had prescribed and would govern the relationships between the importers and the customers. Goober, thank you. We've gone over a bit, but it's an interesting and also a difficult issue. Mr. Levitt, you'll also have the time you need. Thank you, Your Honor. I'm not going to take my full time because I think the questions and the answers are laid on the table. In any event, you'll have eight minutes. Okay. I just want to point out that the likelihood, the overwhelming likelihood is that Customs in its own right wanted to allow importers to know that it had received their waivers and that the waivers would allow it to continue to complete the administrative proceeding because the waiver covered all the entries and protected Customs against the statute so that when Customs published a notice saying, we're going to acknowledge and accept your waivers, it did it for its own purpose, which was to acknowledge to itself that it could continue the administrative process because the waiver fully protected it from the statute. It covered all the entries. It was formally correct. What the acknowledgment was not for was to anticipate that there could be a gotcha if there was some change in the wording used to process and acknowledge the waiver. Why would Customs, when it had a unilateral waiver, want to bear any risk of the waiver being viewed as being ineffectual when it's a unilateral waiver? In other words, the position of Fordness is that— Why did they have this position for many years before? I think for the same reason that Justice Brandeis discussed in this Floresheim case and Stange case where the Congress said that to enhance your ability to keep track of waivers, to make sure subordinates don't force waivers because they were dilatory in pursuing the case, you should acknowledge it, you should agree to it. But not doing it correctly should not allow the taxpayer, in this case the importer, to weasel out of a waiver that a sophisticated company like Ford signs and knows is a giving up of, for the period of the waiver, of the right to the use of the statute as a defense in a case that Customs might bring. Why isn't Ford's argument very fair in the sense that the previous waivers were all acknowledged and accepted, and this one was acknowledged but not accepted? I think that if the issue is, is there a substantive impact to the crossing out of the word acceptance, is it likely that a company like Ford would regard the striking out of the word acceptance as having a substantive impact on the validity of the waiver, given that Customs processed the waiver and so the answer is no. You had years, as Mr. Cooper told us, you had years of practice and published decisions saying that these had to be in the form of an offer. And that's a legal term. It means something, doesn't it? Actually, the Supreme Court has said in the context of waivers, it's a word that doesn't have a legal implication. It's not a preface to a contract. It doesn't have offers? Well, it means that you're waiving contingent upon the government deeming itself protected by the document you've submitted, which is the fact if the document covers all the entries and it uses promissory words of wanting to waive the statute. Mr. Cooper pointed out that the letter that we're talking about did use the word offer. It also, however, in the last paragraph, which is page A400-083, Ford refers to what it did as saying, this waiver is made knowingly and voluntarily. You can look at all sides of the issue can be argued here. Well, didn't you have published TDs that said that Customs would entertain offers? None of those published CDs said that a waiver is not effectual until Customs uses the word accept. The implication, in our opinion, of those notices, which if I were advising Customs how to do it again, I wouldn't advise to do it precisely that way. That's true. But the impact is there's nothing in there. Why would Customs want to put itself at risk after it has a unilateral waiver where the importer knows what it's doing, says, I promise I'm not going to assert the statute? Why would Customs want to assert in a public notice that that was ineffectual unless certain words were used in response to the waiver? There'd be no reason to do that. Our position is that the case is governed by Justice Brandeis's opinions in Florsheim and Stange. The same situation where the revenue is important and the error, if there was one, was something Customs should correct but should not be a lever by which the importer can back out of paying the appropriate duty. Thank you, Your Honors. Unless there are further questions. Is there an issue of tension between 1592D and 1504 where the duties are liquidated by operation of law versus a recovery for improper payment in 1592D? In most cases under 1592D, the duties have been liquidated by operation of law. That is, the importer files papers stating what duty it believes is due. Generally, Customs doesn't take affirmative actions to write a memo saying, I've reviewed this and I agree with what the importer said. Generally what happens is a year passes and nothing's done. And so there's no extension request by Customs. So nothing's done. So it becomes liquidated by operation of law. Two years later when an investigator, when an employee of the importer comes in and says, you know, some of the statements in the entry records were incorrect and Customs then investigates that and finds out they were incorrect. And rather than it being classified as the way the importer classified it, it should have been classified some other way. At that point, if there was a misrepresentation, 1592D obligates Customs to come back and pursue those duties under 1592D. So in most cases, it's a liquidation by operation of law that is then followed by a 1592D action if there were a misrepresentation. The twist in this case, and I admit intuitively you have to ask yourself what's going on because you went after it and they did it incorrectly. Why should that result in not being able to collect the right revenue? Oh, because you're looking at a second bite at the apple because you missed the first thing. You are. You are. So if you decide that somehow Congress meant to penalize Customs for a good faith effort to collect the duties by virtue of extending the liquidations, but as it turned out later, a future court said the investigators didn't do it right. If you want to read that as letting the importer off the hook, then that's not going to be reading the statute. We don't read it that way. We read the statute as saying that when the reason you didn't get the right duty to begin with was a misrepresentation, as was the case here. In other words, if Ford had said the appropriate things in the entry records to begin with, it would have paid the higher duty to begin with. And then if it would have been liquidated by operation of law, the correct duties would have been paid. It didn't do that, however. The entry records in the Customs view said wrong information. And that's why this whole thing came out the way it did. But yes, you have to interpret 59E2B. If you interpret it that Customs is to be penalized when it seeks an extension of liquidation and doesn't justify a reason for that, that the result of that is to penalize Customs and provide a windfall to the importer, which is essentially what you'd be doing, then we'd lose the case. On the other hand, if you say Customs had a good faith effort to do what it regarded in the statute as authorizing it to do, but an investigator wasn't timely in the way he went about it, and therefore the one year thing tripped in and it was liquidated by operation of law, but the duties would have been paid. But the correct duties would have been collected anyway, had Ford not made a misrepresentation and decided to adopt it. Thank you. Thank you, Mr. Cooper. Thank you. Case is submitted.